U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED
2026 APR 13 P 4: 29
CLERK OF COURT

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WISCONSIN**

|  |  |
|---|---|
| MELISSA ZEHE and JACOB SABEL, individually and as next friends of L.S., B.S., C.S., A.S., and W.S., (Minor Children, by next friends),<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON COUNTY; LISA EWING, individually; BETH WANKE, CPS Supervisor, individually; AMBER OOSTDYK, CPS Case Worker individually; DEPUTY ANDREW GRAPER, individually; DEPUTY BRIAN HERBST, individually; LIEUTENANT HERMAN, individually; DOES 1–20, individually;<br><br>Defendants. | Case No. \_\_\_\_ **26-C- 628**<br><br>COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF<br><br>42 U.S.C. § 1983<br>42 U.S.C. § 12132 (ADA Title II)<br>29 U.S.C. § 794 (Rehabilitation Act)<br>Wisconsin Common Law<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

*NOTE TO PLAINTIFFS: Items marked [FILL IN] require hand-completion before filing. All other text is complete.*

### I. INTRODUCTION

This is a civil rights action brought pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the supplemental jurisdiction of this Court over pendant Wisconsin tort claims. Plaintiffs seek relief for a sustained, coordinated campaign of unconstitutional conduct perpetrated under color of state law against Plaintiffs Melissa Zehe and Jacob Sabel and their five minor children.

Defendants — employees and supervisors of Washington County Child Protective Services, members of the Washington County Sheriff's Department, and unknown additional state actors identified herein as Does — acting in concert, forcibly entered Plaintiffs' home without a warrant during business hours; removed all five children without judicial authorization pursuant to a predetermined plan; deceived the children into believing they were going on a sleepover and then, days later, subjected them to invasive

unconsented full body and genital examinations by strangers; fabricated false allegations to justify and sustain the removal; placed two children approximately 61 miles from Plaintiffs' home, one mile outside the geographic jurisdiction permitted by the Wisconsin CPS handbook,; denied kinship placement; failed to accommodate the documented disability and dietary needs of Plaintiffs' autistic daughter; fed gluten to multiple children in violation of known dietary restrictions and then falsely documented that the children 'tolerate gluten'; annotated medical records to suggest vaccine refusal constituted medical neglect; coerced Plaintiffs into signing documents under threat of continued family separation; conducted a second and third warrantless entry and subjected the family to video surveillance; subjected Plaintiff Melissa Zehe to retaliatory unsupervised-contact restrictions; caused the children's foster care status to be permanently embedded in their medical records; and continued harassing agency contacts after the neglect finding was overturned and reclassified in writing as poverty-related. Plaintiffs seek compensatory and punitive damages, declaratory relief, and injunctive relief.

## II. JURISDICTION AND VENUE

**1.** This Court has federal-question subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. § 12132, and 29 U.S.C. § 794.

**2.** This Court has supplemental jurisdiction over Plaintiffs' Wisconsin common-law claims pursuant to 28 U.S.C. § 1367.

**3.** Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and all acts and omissions occurred in Washington County, Wisconsin, within the Eastern District of Wisconsin.

## III. PARTIES

### A. Plaintiffs

**4.** Plaintiff Melissa Zehe is and was at all relevant times a resident of Washington County, Wisconsin, residing at 1181 Decorah Road, West Bend, Wisconsin 53095, and the biological mother of the five minor children at the center of this action. She brings this action on her own behalf and as next friend on behalf of her minor children.

**5.** Plaintiff Jacob Sabel is and was at all relevant times a resident of Washington County, Wisconsin, residing at 1181 Decorah Road, West Bend, Wisconsin 53095, and the biological father of the same five minor children. He brings this action on his own behalf and as next friend on behalf of his minor children.

**6.** Plaintiff Minor Child 1 (L.S.), whose identity is protected pursuant to Fed. R. Civ. P. 5.2, is a minor child and biological child of Plaintiffs Zehe and Sabel, and brings this action through next friend Melissa Zehe. Minor Child 1 is the autistic daughter described in Section IV(G) whose disability and dietary accommodations were denied during foster placement. She was age 8 at the time of the December 2, 2022 removal and suffered the harms described herein.

**7.** Plaintiff Minor Child 2 (B.S.), whose identity is protected pursuant to Fed. R. Civ. P. 5.2, is a minor child and biological child of Plaintiffs Zehe and Sabel, and brings this action through next friend Melissa Zehe. Minor Child 2 was age 6 at the time of the December 2, 2022 removal and suffered the harms described herein.

**8.** Plaintiff Minor Child 3 (C.S.), whose identity is protected pursuant to Fed. R. Civ. P. 5.2, is a minor child and biological child of Plaintiffs Zehe and Sabel, and brings this action through next friend Melissa Zehe. Minor Child 3 was age 4 at the time of the December 2, 2022 removal and suffered the harms described herein, including the unconsented bodily examination described in Section IV(F).

**9.** Plaintiff Minor Child 4 (A.S.), whose identity is protected pursuant to Fed. R. Civ. P. 5.2, is a minor child and biological child of Plaintiffs Zehe and Sabel, and brings this action through next friend Melissa Zehe. Minor Child 4 was age 23 months at the time of the December 2, 2022 removal and suffered the harms described herein, including the unconsented bodily examination described in Section IV(F).

**10.** Plaintiff Minor Child 5 (W.S.), whose identity is protected pursuant to Fed. R. Civ. P. 5.2, is a minor child and biological child of Plaintiffs Zehe and Sabel, and brings this action through next friend Melissa Zehe. Minor Child 5 was one month old at the time of the December 2, 2022 removal and suffered the harms described herein.

> *NOTE: Initials have been substituted throughout per Fed. R. Civ. P. 5.2. Confirm with the E.D. Wis. Clerk whether a motion to proceed under initials is required in this district before filing.*

### B. Defendants

**11.** Defendant Washington County is a municipal entity and political subdivision of the State of Wisconsin. Washington County operates and exercises final policymaking authority over the Washington County Department of Health and Human Services — Child Protective Services division — and is responsible for the hiring, training, supervision, discipline, and retention of all CPS personnel named herein, as well as the policies, customs, and practices of its Sheriff's Department. Upon information and belief, Washington County receives federal child welfare funding under Title IV-E of the Social Security Act, 42 U.S.C. § 670 et seq., subjecting it to Section 504 of the Rehabilitation Act.

12. Defendant Lisa Ewing was at all relevant times a CPS caseworker employed by Washington County, acting as lead caseworker on this matter, within the scope of her employment and under color of state law. Upon information and belief, Defendant Ewing has since transferred employment to Fond du Lac County, Wisconsin. She is sued in her individual capacity and will be served at her last known employment address or as identified through discovery.

13. Defendant Beth Wanke was at all relevant times a CPS supervisor employed by Washington County, acting under color of state law. She is sued in her individual capacity.

14. 14. Defendant Amber Oostdyk was at all relevant times a CPS caseworker employed by Washington County, acting as a secondary caseworker at the December 2, 2022 removal under color of state law. Defendant Oostdyk was physically present at Plaintiffs' residence during the warrantless entry and removal, participated in loading the children into the pre-staged transport vehicle, and failed to support or advocate for kinship placement. Defendant Oostdyk acted in a secondary role during the removal. She is sued in her individual capacity.

15. Defendant Deputy Andrew Graper was at all relevant times a deputy sheriff employed by the Washington County Sheriff's Department, acting under color of state law. He is sued in his individual capacity.

16. Defendant Deputy Brian Herbst was at all relevant times a deputy sheriff employed by the Washington County Sheriff's Department, acting under color of state law. He is sued in his individual capacity.

17. Defendant Lieutenant Herman was at all relevant times a supervising law enforcement officer employed by the Washington County Sheriff's Department, acting under color of state law. He is sued in his individual capacity. Supervisory liability does not require physical presence inside the premises; Defendant Herman coordinated and authorized the response operation and is liable for the constitutional violations carried out pursuant to that coordination.

18. Defendants Does 1–20 are individuals whose true identities are presently unknown to Plaintiffs and who acted under color of state law at all relevant times. Doe 1 is a male CPS caseworker employed by Washington County who was physically present at the December 2, 2022 removal, participated in loading the children into the pre-staged transport vehicle, improperly installed child car seats placing the children at risk of physical harm during transport, and was initially assigned as a caseworker on the matter before transferring off the case. Does 2–5 are additional unknown CPS caseworkers, supervisors, and/or foster-placement agents who participated in the removal, placement, or oversight of Plaintiffs' children. Does 6–10 are unknown CPS or supervisory personnel who participated in the second and third warrantless entries. Does 11–15 are unknown medical providers, clinic staff, or facility personnel

who ordered, conducted, or authorized the unconsented physical examinations of the minor children on December 6 and 8, 2022, including the genital examinations all all children and forced retraction and urology referral of at least one confirmed minor boy, acting under color of state law by virtue of their coordination with and direction by CPS personnel. Does 16–20 are unknown Washington County supervisory or policymaking officials whose decisions, ratifications, or deliberate indifference contributed to the constitutional violations alleged herein. Plaintiffs will seek leave to amend to substitute true names when ascertained through discovery.

## IV. FACTUAL ALLEGATIONS

*Note on Information and Belief Allegations.* Certain material facts alleged herein are within the exclusive knowledge, custody, or control of Defendants and are not yet accessible to Plaintiffs. Such allegations are pleaded upon information and belief, consistent with *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Specifically, the following categories of facts are within Defendants' exclusive possession and will be confirmed or supplemented through discovery: (a) the identity of the anonymous complainant and the contents of the complaint that prompted the December 2, 2022 response; (b) the name and identity of the medical facility and the individual who ordered the December 6 and 8, 2022 examinations of the minor children; (c) the specific mechanism by which Defendants obtained knowledge of Minor Child L.S.'s autism diagnosis prior to or at the time of removal; (d) the identity of all personnel involved in the second and third warrantless entries; (e) the date and authorizing basis for the second warrantless entry; (f) the full record of CPS contacts with the family following the February 20, 2023 exoneration; (g) all pre-removal communications among CPS and law enforcement establishing that the removal was predetermined; (h) all communications between Washington County CPS and the District Attorney's Office that gave rise to the retaliatory criminal charges; and (i) all records reflecting the preparation and staging of the transport vehicle with age- and size-specific car seats prior to arrival at the residence. Plaintiffs' inability to plead these facts with greater specificity at this stage is not a failure of the complaint; it is the direct result of those facts being held exclusively by Defendants.

### A. Conditions at the Residence — December 2, 2022

19. On December 2, 2022, Washington County CPS and Washington County Sheriff's Department personnel responded to Plaintiffs' residence at 1181 Decorah Road, West Bend, Wisconsin 53095. The response was based on allegations of a malfunctioning furnace and claimed plumbing deficiencies. Plaintiffs acknowledged the furnace required replacement and were actively pursuing funds to replace it, including through community fundraising efforts; Plaintiffs ultimately obtained furnace funding through the WHEAP assistance program — a resource Plaintiff Melissa Zehe located without any caseworker assistance. The administrative delay associated with that program extended the removal period by approximately one additional week beyond what would otherwise have been necessary. The removal occurred during normal business

hours on a regular business day, when a warrant was readily obtainable. Plaintiffs are law-abiding parents who do not use drugs or alcohol and who practice natural and gentle parenting. There was no history of domestic violence, mental health crisis, or substance abuse for either plantiff.

**20.** Plaintiffs specifically and categorically deny the allegations regarding nonfunctioning plumbing. The plumbing inside the residence was fully operational at all times. Defendants' assertion that the plumbing was not functioning was disproved by Plaintiffs during the encounter itself. Defendant Ewing also initially asserted that no food was present in the home. Plaintiff Melissa Zehe immediately challenged this assertion. Deputy Graper's own police report confirms that food was present in both a mini-refrigerator and a chest freezer on the enclosed porch, as well as in kitchen cabinets. Clean, drying dishes were present in a dish rack above the sink. Defendant Ewing subsequently corrected the food-absence statement; however, the correction did not prevent other fabricated allegations from being entered into placement and medical records. Importantly, Plaintiff Melissa Zehe was not home at the time of the initial contact because she was actively working a Door Dash delivery shift — confirmed in Deputy Graper's own police report — directly refuting any suggestion of parental abandonment.

**21.** The weather on December 2, 2022 was temperate — approximately forty-six degrees Fahrenheit and sunny. All five minor children were enjoying the outdoors and safe with their father, Jacob. The home contained functional supplemental heat sources plainly visible upon entry. The upstairs bedrooms were clean and organized, as noted in the police report. Clean dishes were also observed to be drying above the sink in a over-sink dish rack and documented. Household items were temporarily displaced but did not create unsafe conditions. The family was not using the upstairs at the time due to the broken furnace, which also rendered a staircase railing that was under construction temporarily unnecessary; the children were not at risk from the railing. One refrigerator had broken while Plaintiffs were out of state and was sealed intentionally to safely contain spoiled contents — a deliberate and responsible precautionary measure taken at a time when the children were not present and Plaintiff Melissa Zehe was recovering postpartum following the birth of W.S. — not evidence of neglect. The conditions reported — even as characterized by Defendants — were economic in nature, fully amenable to corrective measures Plaintiffs were willing and able to undertake without removal. Defendants refused to allow Plaintiffs to remain elsewhere with the children while remedying the conditions, denying an obvious less-restrictive alternative to removal.

### B. Warrantless Entry, Parental Seizure, and Video Surveillance

**22.** Defendants entered Plaintiffs' home without a warrant. Plaintiffs demanded that Defendants produce a valid warrant on multiple occasions over the course of approximately four hours. Defendants acknowledged that a warrant could be obtained but never obtained one, despite the entry occurring during normal business hours when judicial officers were available. No warrant was ever presented.

**23.** No exigent circumstances existed that could lawfully excuse the absence of a warrant. No child faced immediate physical danger; no medical emergency was occurring; there was no active violence,

no immediate threat to life, and no risk of destruction of evidence. The Fourth Amendment's warrant requirement protects the home above all other places. *Payton v. New York*, 445 U.S. 573, 586 (1980). Defendants' warrantless entry was presumptively unreasonable and constitutionally prohibited.

**24.** Defendants entered by physically pushing past Plaintiff Jacob Sabel without his verbal agreement or consent. Despite this, the police report falsely states that 'Sabel allowed deputies to follow him into the residence' — a direct mischaracterization contradicted by Plaintiffs' account of being physically pushed aside. Plaintiffs were told that if they did not comply with handing over their children they would be arrested. Compliance obtained through an explicit threat of arrest does not constitute voluntary consent. *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). The official police report generated in connection with the December 2, 2022 incident further falsely identified Plaintiffs as having been 'arrested,' despite the fact that Plaintiffs were never placed under arrest, not taken into custody, not handcuffed, not transported, and not advised that they were under arrest at any time. This statement in the report is materially false and misrepresents the nature of the interaction between Plaintiffs and law enforcement.

**24a.** Throughout the encounter on December 2, 2022, Defendants subjected both Plaintiffs to an unlawful seizure of their persons. Law enforcement and CPS personnel physically shadowed Plaintiffs throughout their home, followed them from room to room, and prohibited them from moving freely within or departing the residence. Defendants separated Plaintiffs from each other on multiple occasions for individual questioning. Plaintiffs were told that refusal to comply with the removal would result in their arrest. No Miranda warnings were administered to either Plaintiff, and neither Plaintiff was told they were under arrest or detention, yet a sheriff's vehicle blocked their driveway entierly. No booking was conducted. A reasonable person in Plaintiffs' circumstances — surrounded by law enforcement and CPS personnel inside their own home, physically shadowed, separated for interrogation, and told non-compliance would result in arrest — would not have felt free to leave or terminate the encounter. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Florida v. Bostick*, 501 U.S. 429, 434 (1991). This warrantless, non-consensual seizure of both Plaintiffs' persons, absent probable cause, constitutes an independent Fourth Amendment violation, incorporated into Count I and supporting the new Count IIA set forth below.

**25.** During the weekend of the removal, individuals were observed video recording the exterior of Plaintiffs' home and property. The identity of those conducting the surveillance was not confirmed; it may have been conducted at the direction of Defendants, or by third parties who learned of the family's situation. Regardless of the source, the surveillance was unwanted, invasive, and constituted an intrusion into the family's reasonable expectation of privacy in their home and curtilage. Plaintiffs experienced it as threatening and destabilizing.

**26.** In addition to the warrantless entry on December 2, 2022 and the second warrantless entry described in Section IV(J), Defendants required Plaintiffs to submit to a third warrantless inspection — of a mobile home owned by the family, at which Plaintiffs were not residing at the time. Defendants stated they needed to inspect 'all' residences. No exigency, warrant, or valid consent justified this

inspection. This constitutes an independent Fourth Amendment violation incorporated into Count I.

### C. Predetermined Warrantless Removal

**27.** Defendants removed all five of Plaintiffs' minor children without a judicial order and without any factual predicate constituting a genuine emergency. No child faced imminent bodily harm; no abuse — as opposed to poverty-related housing conditions — had been alleged or observed. Defendants treated Plaintiffs' family's natural and holistic parenting lifestyle and financial condition — including their choice not to vaccinate, their homeschooling practice, their organic dietary choices, and their children playing barefoot outdoors and having sandy soil on their skin, post playing outside — as indicators of neglect. None of these lifestyle choices or financial circumstances constitute neglect under Wisconsin or federal law.

**28.** Removal of a child from parental custody absent exigent circumstances violates the Fourth Amendment. *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000). Parents hold a fundamental liberty interest in the care and custody of their children, the deprivation of which requires at minimum pre-deprivation process absent true emergency. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). No such emergency existed here.

**29.** To deceive the children, avoid resistance, and make them the minor children feel safe, Defendants told the children they were going on a sleepover. Days later, those same children were transported to a medical facility, stripped of their clothing, and subjected to comprehensive full body physical examinations including examination of their genital areas by strangers they had never met. The betrayal of the children's trust at the moment of removal, followed by the invasive physical violation of their bodies days later, constitutes a pattern of conduct that is conscience-shocking in the most fundamental sense. The children's sense of safety, bodily autonomy, and trust in adults in positions of authority was permanently damaged.

**30.** When Defendants arrived, their vehicles included a transport minivan already equipped with child car seats that were sized and configured to match the specific ages and sizes (except an inaccurate car seat size for their toddler in an unsafe mistake) of Plaintiffs' five children— including an infant bucket seat corresponding to Plaintiffs' youngest child — before any lawful on-scene assessment had been conducted. The presence of age- and size-specific seating for each of the five children in a pre-staged transport vehicle demonstrates that Defendants had obtained individualized information about Plaintiffs' household composition and planned the removal prior to arrival. This is not consistent with standard vehicle preparedness; it is direct evidence of a predetermined, coordinated removal operation.

**31.** Several of the pre-staged car seats were not properly secured, including at least one infant bucket seat. Plaintiffs were required to intervene to protect their own children's physical safety during the loading process. Doe 1 and Defendant Oostdyk were among the CPS personnel responsible for loading the children and overseeing transport preparations.

**D. Out-of-Jurisdiction Placement, Kinship Denial, and Forced Sibling Separation**

32. Upon removal, Plaintiffs immediately requested that the children be placed with a grandfather who was physically present and willing to accept all five children. Defendants, including Defendant Ewing and Defendant Oostdyk, refused kinship placement without lawful justification and without making the individualized written findings required before such a denial. The kinship evaluation records, or the absence of any such records, are within Defendants' custody and are subjects of discovery.

33. Instead, Defendants placed the five children across multiple foster homes. Two of the children were placed approximately sixty-one miles from the family residence — a distance that, upon information and belief, exceeds the geographic placement limit established in the Wisconsin CPS foster placement handbook by approximately one mile, constituting a regulatory violation in addition to a constitutional deprivation. The children were separated from one another as well as from their parents. Forced sibling separation, absent individualized findings demonstrating that separation serves each child's best interests, caused severe and lasting emotional trauma to each child. Defendants also attempted to place the children with an individual who was on a no-contact list and who had previously mistreated the children, while babysitting them, demonstrating deliberate indifference to the children's safety.

**E. Fabrication and Dissemination of False Allegations**

34. It is confirmed that at least defendant Ewing knowingly fabricated material falsehoods to justify the removal and sustain state custody. These fabrications included: (a) the initial false food-absence claim, contradicted at the scene by responding law enforcement officers, which Defendant Ewing later corrected — but only after the false record had already been created and disseminated; (b) false claims of fly infestations and animal feces inside the home, which appeared in medical maintained by at least two foster families; (c) a false claim that every appliance in the home was broken; (d) a false claim of moldy dishes in the sink — the dishes were clean, as documented by responding officers, and there were no moldy dishes in the home; (e) a false narrative that Plaintiff Jacob Sabel was living in a tent due to the home's condition — the tent referenced by Defendants referred to voluntary family camping in the backyard; (f) a false claim attributed to Plaintiffs' autistic daughter that she could see her breath indoors due to cold — a claim inconsistent with her IEP documentation reflecting her limited understanding of months and seasons; (g) false statements made in court proceedings that the children had no never been schooled, because they were homeschooled, when in fact the they had been in public school previously and homeschooled at the present time., and when Plaintiffs had exercised their fundamental right to homeschool their children, *Wisconsin v. Yoder*, 406 U.S. 205 (1972); and (h) false statements in court proceedings that one child had never received dental care. Defendants' claims of dental neglect were contradicted by records showing ongoing dental care. In fact, that child — C.S. — had received continuous, documented pediatric dental care under general anesthesia at Children's Minneapolis in

November 2019, multiple subsequent restorative and preventive appointments, Silver Diamine Fluoride treatments, and consistent six-month recall care. The dental records, printed on December 6, 2022 — the same day as the first foster care medical examination — confirm active, professional management of C.S.'s dental needs by a licensed pediatric dentist. The CPS allegation of dental neglect is directly and completely refuted by documentary evidence in CPS's own possession. Following reunification, Dr. Robert Fox diagnosed C.S.'s condition as (K00.4) Disturbances in Tooth Formation — a congenital developmental condition, not neglect — and documented: 'No abuse/neglect evident.'

**35.** Critically, the fabrications described in subsections (b) through (f) did not appear in CPS's stated reasons for removal, in the police report, or in any contemporaneous photographs. Their subsequent appearance in foster placement and medical records demonstrates these allegations were manufactured after the fact. The fabrications in subsections (g) and (h) were not used as justification for removal but were presented in court proceedings on the record, prejudicing Plaintiffs' ability to obtain prompt reunification and their standing before the court. Additionally, the criminal complaint filed by Lieutenant Tim Kemps incorporated a statement attributed to one of the children that they were not in school 'as their parents had not found a school for them yet' — a hearsay statement elicited from a minor child without parental presence, knowledge, or consent, used to support retaliatory criminal charges against Plaintiffs for the lawful exercise of homeschooling. Following reunification, an independent licensed physician, Dr. Robert Fox, DOM/APNP, examined the children on January 18, 2023, and documented 'No abuse/neglect evident' in the individual records of all five children: L.S. (age 8), B.S. (age 6), C.S. (age 4), A.S. (age 23 months), and W.S. (age 1 month). Every child received a well child examination assessment. These five independent post-removal medical clearances from a single licensed physician constitute irrefutable documentary evidence that the original removal lacked any legitimate medical basis. A state official who knowingly fabricates evidence to deprive an individual of a protected liberty interest violates due process. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

**36.** The dissemination of false allegations to foster families caused placement personnel to treat the children differently, compounding the children's trauma and prejudicing Plaintiffs' ability to obtain timely reunification. At least two foster families who included the fly infestation and animal feces allegations in the children's medical records refused to permit telephone contact between the children and their parents during the placement period. During a warrantless entry into Plaintiffs' home, Defendant Wanke relied on conditions arising from Plaintiffs' financial hardship, including issues involving the furnace and household appliances, in efforts to compel Plaintiffs to admit culpability as a condition of cooperation. She further accused Plaintiff Melissa Zehe of lying about her daughter's gluten sensitivity, insisted the child "tolerated gluten," and pressured Plaintiffs to admit guilt regarding both the gluten claim and the condition of their home, all while inside Plaintiffs' residence without a warrant, court order, or valid consent. Defendants conducted interrogation-style interviews of both Plaintiffs and family members, including the interrogation of Jacob Sabel's mother to suggest that the alleged household conditions were a lifelong pattern, a characterization that was disproved.

**F. Unconsented Physical Examinations, Urology Referral, and Bodily Integrity Violations**

37. On December 6 and December 8, 2022, all five minor children were transported to a medical facility (identity to be confirmed through discovery) without the knowledge or consent of either Plaintiff. The children were stripped of their clothing and subjected to invasive examinations, including manipulation of their genital areas. All five children — including the infant W.S. and the autistic daughter L.S. — had their genital areas examined. The examinations were ordered by Does 11–15,whose identities are in Defendants' records and will be established through discovery. No allegation of sexual abuse had been made that could justify the nature or scope of the examinations conducted. The examinations were conducted just days after the children had been told they were going on a sleepover— a deception that made the subsequent physical violation of their bodies by strangers all the more traumatic.

38. During the examinations, the minor childrens' genital areas were physically examined, including forced retraction of intact anatomical tissue of at least one minor boy. Plaintiffs found on their own within the medical records that one minor boy was subsequently referred to urology, where surgical intervention was discussed; he was prescribed a hormonal cream and directed to perform stretching exercises on his foreskin — procedures carried out at the foster family home without the knowledge or consent of either Plaintiff and without any clinically indicated basis arising from abuse or trauma. These medical interventions were authorized and supervised by Does 11–15 in coordination with CPS personnel. They constituted a continuing violation of the child's bodily integrity and Plaintiffs' fundamental right to make medical decisions for their minor children

39. Additional un-consented interventions included: application of fluoride treatments to all children'steeth — directly violating Plaintiffs' long-standing documented refusal of fluoride, recorded across multiple dental visits as 'no fluoride ever per parents'; forced haircuts, including the first haircut of at least one child — an irreplaceable developmental milestone permanently taken from Plaintiffs — and at least one haircut performed over the expressed objection of a child old enough to refuse; enrollment of at least one child in a religiously affiliated school without parental knowledge or approval, *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); isolation of one child in an upstairs bedroom separated from the foster family where he felt alone and frightened sleeping on the upper floor without anyone else nearby; and transport of another child in the front seat of a vehicle without age-appropriate booster-seat protection.

**40.** One child was told by foster placement personnel that the child would not be returning home for Christmas — a statement that proved false, as reunification occurred on December 23, 2022, two days before Christmas. This statement caused profound and measurable emotional harm to the child at a developmentally significant time.

*NOTE: Medical facility and ordering defendant (Does 11–15) to be identified through discovery. See Subpoena Spec. D and Section XII of Discovery Requests.*

### G. Failure to Accommodate Plaintiffs' Autistic Daughter; Gluten Violations; Vaccine Record Falsification

**41.** One of Plaintiffs' daughters has been diagnosed with autism spectrum disorder and is a qualified individual with a disability under Title II of the ADA, 42 U.S.C. § 12131(2), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Her autism produces significant sensory hypersensitivity affecting her tolerance of hair styling and tactile stimuli. She carries co-occurring diagnoses of (R20.9) Unspecified Disturbances of Skin Sensation — directly relevant to her intolerance of braided hairstyles — and (F80.9) Developmental Disorder of Speech and Language. She also has a documented dietary sensitivity to gluten.

**42.** L.S.'s diagnoses of autistic disorder (F84.0), unspecified disturbances of skin sensation (R20.9), and developmental disorder of speech and language (F80.9) are confirmed in her medical records. Defendants had knowledge of L.S.'s autism diagnosis; the specific mechanism of that notice is within Defendants' records and will be established through discovery, including through CPS intake records, IEP records obtained by CPS, and communications among CPS personnel prior to the removal. See Discovery Requests, Section II, Interrogatory 9 and RFP 13. Plaintiff Melissa Zehe verbally informed Defendants of L.S.'s gluten sensitivity at the scene on December 2, 2022, at the time of removal. L.S.'s autism diagnosis also appeared in her medical records accessible to or obtained by CPS, and was communicated to foster placement personnel, who disregarded it. Despite this notice, during foster placement braids were installed in L.S.'s hair. Her diagnosed skin sensation disorder (R20.9) directly explains her inability to tolerate this sensory stimulus — this was not a preference but a documented medical condition. Rather than accommodating this disability manifestation, foster placement agents threatened her with punishment for attempting to remove the braids. No individualized accommodation plan was ever implemented for this child during the placement period. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7); *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

*NOTE: The mechanism of autism notice is subject to discovery. See Discovery Requests Section II, Interrogatory 9 and RFP 13. If confirmed before filing, insert specific mechanism in ¶42.*

**43.** Despite the known gluten sensitivities of multiple Plaintiff children, foster families provided gluten-containing food to more than one child, including the autistic daughter. Foster placement agents then entered a false notation in each affected child's medical record stating that the child 'tolerates

gluten.' This notation is medically false, was made without any legitimate clinical basis, and permanently embedded a dangerous inaccuracy in the children's medical records that may affect their future medical care.

**44.** Plaintiffs exercise their right to decline vaccination for their children pursuant to Wisconsin law. Plaintiffs formally filed official Wisconsin Department of Health Services Student Immunization Record forms (Form F-04020L, Rev. 6/2020) for each child enrolled in school. For C.S. (Holy Trinity/WBSD, 4K), and for B.S. (Decorah Elementary, 3rd grade), both parents signed the official DHS forms on January 5, 2023 — thirteen days after reunification and while criminal charges were being prepared against them. Each form checked both the health waiver ('should not receive any vaccines') and the religious exemption for all vaccines: DTaP, Polio, Hepatitis B, MMR, and Varicella. The school Skyward records for L.S. also show all state-required vaccines listed as 'Waiver' status. All waivers were accepted by the respective schools without objection — confirming that vaccine refusal is a lawful parental choice properly exercised through official state channels. C.S.'s enrollment at Holy Trinity/WBSD in Pre-Kindergarten (4K) and B.S.'s enrollment in 3rd grade at Decorah Elementary for the 2022–2023 school year directly refute the criminal complaint's allegation that the children had never received schooling. Despite this documented legal compliance, foster placement agents annotated the children's medical charts to suggest that vaccine refusal constituted medical neglect. This characterization is false, directly contradicted by official state school records, and constitutes a fabrication embedded in the children's permanent medical records that continues to stigmatize the family.

### H. Contamination of Children's Medical Records and Ongoing Harm

**45.** As a direct and proximate result of Defendants' unlawful removal and foster placement, the children's status as foster children was recorded in their medical records, foster family contact information was entered as emergency contact information, and the children's records were flagged to reflect their foster care status. These entries were not corrected upon reunification and continued to appear at several subsequent medical encounters, requiring Plaintiffs to repeatedly explain that the placement was the result of an unlawful removal subsequently overturned.

**46.** The presence of foster care history, false "tolerates gluten" notations, and a false medical neglect annotation associated with vaccine choice in the children's medical records constitutes a continuing harm that manifests at subsequent healthcare encounters. These inaccurate and stigmatizing entries have tainted the children's medical charts, resulting in judgment, bias, and emotional distress when Plaintiffs seek care, and altering how they are perceived and treated by providers. Plaintiffs are not required to explain or justify prior state involvement, yet the presence of these notations creates an ongoing burden and stigma in medical settings. This continuing harm is proximately caused by Defendants' original unlawful removal and improper record-keeping.

## I. Shelter Hearing and State Proceedings

**47.** Following removal, a shelter care or temporary custody hearing was held several days later, in Washington County, Wisconsin. At that hearing, Defendants presented fabricated allegations described herein to the presiding court. Plaintiffs did not have court-appointed legal counsel at the hearing despite requesting it; they were required to make a written request before counsel was appointed, depriving them of representation at a critical stage of the proceedings.

**48.** Plaintiffs were subsequently coerced into signing CHIPS-related documents as a condition of regaining contact. Plaintiffs were not informed of their ability to object, and their court-appointed counsel did not object, when statement were made on the record asserting that Plaintiffs' children were not attending school and would be placed in public school, resulting in Plaintiffs being deprived of a meaningful opportunity to present evidence of their lawful homeschooling practices.

**49.** Defendant Wanke and others pressed Plaintiffs to admit culpability as a condition of cooperation, further vitiating the voluntariness of any acknowledgment Plaintiffs may have made.

**50.** The presiding judge told Plaintiff Melissa Zehe that her social media accounts would be scrutinized. This statement, made from the bench, caused Plaintiff Zehe to close her social media accounts for over a year — a period that extended beyond the close of the case — resulting in the permanent loss of the algorithmic audience she had built for her online sticker business on marketplace platforms. This constitutes a judicially induced chilling effect on Plaintiff Zehe's First Amendment rights of expression and commercial activity.

**51.** Defendants never provided Plaintiffs with a written list of required repairs until after prolonged and repeated requests. Defendant Ewing made a contemptuous remark indicating Plaintiffs would not be able to address the alleged deficiencies within a weekend, while visibly smiling during the removal of the children. Within a single weekend, Plaintiffs corrected substantially all alleged deficiencies — other than the furnace, which required the WHEAP program. On December 16, 2022 — fourteen days after the removal — Deputy Graper returned to the residence and documented in his own police report that the porch area was significantly cleaner; the kitchen had no clutter; the bathroom was clean; the remainder of the house was clutter-free; the stairs had a railing and drywall was being installed; and the mold-containing refrigerator had been replaced with a working refrigerator containing fresh food. This police-confirmed remediation was completed while Defendants continued to withhold a written correction list and maintain custody of the children, demonstrating that no legitimate child welfare basis remained for the continued removal.

> *NOTE: The shelter hearing date, court name, and CHIPS case number are obtainable from Washington County Circuit Court records and from CPS case files. See Discovery Requests Section X (Circuit Court Subpoena). Insert confirmed details in ¶47 and ¶48 before filing.*

### J. Second Warrantless Entry

**51.** After the initial removal and during the period of CPS supervision, Defendants conducted a second and third warrantless entry into Plaintiffs' home. Upon information and belief, this entry occurred on or about December 16, 2022, consistent with Deputy Graper's police report of that date documenting conditions inside the residence; the precise date and the identity of all CPS personnel present are within Defendants' visit logs and case notes and will be established through discovery. As with the initial entry, no warrant was obtained. CPS personnel entered the premises without a court order and without voluntary consent; any purported consent was vitiated by coercive pressure that led Plaintiffs to reasonably believe that refusal would delay or jeopardize the return of their children. CPS personnel also told Plaintiffs that they had 'ways to find' them if Plaintiffs left with their children, constituting coercive surveillance threats inconsistent with lawful child welfare oversight.

*NOTE: The exact date of the second warrantless entry and the identities of all CPS personnel present are within Defendants' visit logs and case notes and will be established through discovery. See Discovery Requests Section II, Interrogatory 11 and RFP 16; Section IV, Interrogatory 1.*

### K. Exoneration, Poverty Admission, and Retaliatory Conduct

**52.** Plaintiffs filed a formal administrative appeal of the neglect determination. Washington County HSD held an agency review on February 17, 2023, and issued formal Notice of Final Determination letters to both Jacob Sabel and Melissa Zehe, dated February 20, 2023 (Washington County HSD Form DCF-F-5038-E, issued under Director Julie Driscoll). The letters declared the neglect finding unsubstantiated for each of the five children individually — A.S., B.S., C.S., L.S., and W.S. — in ten separate findings of Unsubstantiated, one for each parent-child combination. Each finding contained the identical conclusion: 'It was identified by the panel that the identified maltreatment was due to poverty. Therefore, the substantiation of [parent] for [child] is overturned, and is unsubstantiated.' The determination letters also confirmed: the plumbing was in working condition; the children's basic needs were being met; Plaintiffs were an outdoor family; Plaintiffs used alternative heating; the refrigerator was sealed to protect children from spoiled food; Melissa was recovering postpartum following W.S.'s birth; and in the police reports and photographs, there was no indication of feces on the floor of the home. Jacob Sabel provided paper proof of repairs, photographs, weather records, and L.S.'s IEP. The removal of children based solely on poverty — absent abuse or genuine neglect — is prohibited. 42 U.S.C. § 5106a(b)(2)(B)(ii); Wis. Stat. § 48.13. A long-term CPS caseworker acknowledged that absent Defendant Ewing's personal involvement, the children likely would not have been removed.

**52a.** The February 20, 2023 exoneration document is the County's own pretext strike. The same agency that conducted the December 2, 2022 removal subsequently admitted in writing — ten times on a single form — that 'the identified maltreatment was due to poverty.' This admission directly contradicts the stated basis for removal (child neglect based on home conditions), is confirmed by Deputy Graper's

own December 16, 2022 police report documenting full remediation, and is corroborated by five independent post-removal medical clearances showing no abuse or neglect in any of the five children. Three successive characterizations of the same event — neglect, then poverty, then criminal conduct — each internally inconsistent with the others, constitute the hallmark of pretextual decision-making. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (shifting justifications are evidence of pretext); *Forrester v. White*, 484 U.S. 219, 229 (1988) (courts look to the real, not stated, basis for government action). Defendants' stated justification for every adverse act described herein — removal, continued custody, criminal charges, unsupervised-contact restriction — was poverty dressed as neglect, and then retaliation dressed as prosecution. The documentary record proves both.

*NOTE: Nickole Schmidbauer's statement is preserved as evidence. She is not named as a defendant.*

**53.** Plaintiffs engaged in protected petitioning activity by filing the formal administrative appeal that produced the February 20, 2023 exoneration. That exoneration — the direct result of Plaintiffs' exercise of their constitutional right to petition — triggered an immediate, retaliatory government response. The very next day — February 21, 2023 — criminal charges were filed against both Plaintiffs: Case Nos. 2023CF000094 (Sabel) and 2023CF000095 (Zehe), DA Case No. 2022WA002952, sworn by Lieutenant Tim Kemps, signed by ADA Jeanette K. Corbett, assigned ADA Stephanie L. Hanson, and assigned to Judge Sandra J. Giernoth, Branch 4. Plaintiffs were charged by criminal summons only — never physically arrested or booked. Plaintiffs were never placed under arrest, not taken into custody, not handcuffed, not transported, and not advised that they were under arrest at any time. Nevertheless, the official police report generated in connection with the December 2, 2022 incident falsely identified Plaintiffs as having been 'arrested,' and the charges appeared on background check databases as pending felonies, causing disqualification from gig employment platforms. The DA case number prefix '2022WA' confirms the retaliatory investigation was opened in 2022 while the CPS proceedings were still active and before the exoneration. All five counts expressly alleged that harm 'did not occur' — self-defeating on their face. The charges were dismissed prior to the scheduled April 3, 2023 initial appearance, when that court date was cancelled and the charges were resolved without a hearing; the precise dismissal date is within court records and will be confirmed through discovery. Following the exoneration, CPS falsely reported to Plaintiffs' family that Plaintiff Melissa Zehe could not be with the children unsupervised, citing concern she would 'influence' them by telling them the truth about the removal — a retaliatory restriction on protected speech and family association without legal basis.

### L. Post-Exoneration Harassment

**54.** Even after exoneration, Washington County CPS personnel made multiple follow-up contacts and intrusions into Plaintiffs' home and family life from December 23, 2022 through the final dismissal of the CHIPS case, without any legitimate child welfare basis. The precise number and dates of those contacts are within Defendants' visit logs and will be established through discovery. Following the

return of the children on December 23, 2022, Defendants required Plaintiffs' family members to provide continuous supervision of the household for several days — effectively placing the family under around-the-clock surveillance without a court order. CPS also used C.S.'s medically documented dental history — a condition actively managed by a licensed pediatric dentist with a documented record of care, including a general anesthesia procedure at Children's Minneapolis — as a further pretext for continued CPS involvement, despite the dental records having been printed on December 6, 2022 and being in CPS's possession, fully confirming active professional dental management.

*NOTE: The precise number and dates of post-exoneration CPS contacts are within Defendants' visit logs and will be established through discovery. See Discovery Requests Section II, Interrogatory 11 and RFP 16.*

## M. Harms to Plaintiffs and the Minor Children

**55.** As a direct and proximate result of Defendants' acts and omissions, Plaintiff Melissa Zehe was simultaneously breastfeeding newborn W.S. and toddler A.S. at the time of removal. The forced separation caused complete cessation of her milk supply, with attendant physical pain and emotional consequences. Plaintiffs also experienced significant distress during and in the immediate aftermath of the removal, with effects that manifested physically in their bodies, and continue to experience lasting, though reduced, impacts from that event.

**56.** Plaintiffs have suffered extensive and continuing economic harm directly caused by Defendants' conduct. The constant imposition of surprise visits, family training sessions, mandatory meetings, and court dates made it impossible for Plaintiffs to maintain consistent employment. The pendency of felony criminal charges filed by summons — with no arrest or booking — in retaliation for Plaintiffs' administrative appeal temporarily disqualified Plaintiffs from gig employment platforms, including food delivery and care provider services, causing direct loss of income. Although the felony charges were ultimately dismissed, they remained on Plaintiffs' record for approximately two years, during which time Plaintiff Melissa Zehe adopted a pen name in her personal and professional life out of fear of judgment, stigma, and loss of privacy. She continues to introduce herself by that pen name to new acquaintances due to the lasting damage to her sense of personal safety and identity. Plaintiffs were also afraid to apply to volunteer at their children's school for field trips for fear that background check disclosures would expose their private legal history. The retaliatory criminal charges also forced Plaintiffs to retain a criminal defense attorney, incurring legal fees of over $4,000 that required them to charge credit cards and borrow money that remains owed. To satisfy credit card debt arising from these legal costs, Plaintiffs were compelled to sell a family vehicle at a loss of approximately $3,000. These economic harms are direct and proximate consequences of the criminal filing under circumstances giving rise to an inference of retaliatory motive.

**57.** Plaintiff Melissa Zehe operated an online sticker business through marketplace platforms that generated income and had an established algorithmic audience. As a direct result of the court-induced

social media shutdown described in Section IV(I), Plaintiff Zehe lost that algorithmic audience and has not been able to rebuild it. The loss of that business income is a direct and proximate economic harm caused by the judicial chilling of her First Amendment activity.

**58.** Plaintiffs delayed resuming homeschooling for a period following the removal out of concern for renewed CPS scrutiny — depriving the children of the educational approach their parents had chosen and to which they had a constitutional right. *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Plaintiffs also experienced sustained harm to their sense of safety and privacy in their own home. They have been made to feel targeted for their holistic and natural parenting practices — including dietary choices, homeschooling, and vaccine decisions — and continue to account for the risk of CPS scrutiny when making family decisions.

**59.** The five minor children — L.S. (age 8 at removal), B.S. (age 6), C.S. (age 4), A.S. (age 23 months), and W.S. (age 1 month) — have suffered placement trauma, regression in developmental and emotional functioning, loss of trust in authority figures, behavioral deterioration, heightened sibling conflict from forced separation, and severe ongoing emotional distress. The children being told they were going on a sleepover and then full body and genital examination by strangers sustained compound trauma from the betrayal of trust combined with the bodily violation. The child isolated on the upper floor away from the foster family and siblings felt alone, frightened, and abandoned. The child told she would not be home for Christmas sustained specific acute psychological harm. The minor boys subjected to unconsented genital examinations, forced anatomical retraction, urology referral, and hormonally administered foster-home procedures sustained bodily integrity trauma and ongoing psychological harm. Plaintiffs lost irreplaceable firsts — including the first haircut of at least one child and the first smile milestones captured in that child's early life — stolen by a removal that the County later admitted was driven by poverty, not neglect.

**60.** In addition to the foregoing, the contamination of the children's medical records — including false gluten tolerance notations, false medical neglect characterizations tied to vaccine choice, and foster care designations — constitutes a continuing harm that often manifests at subsequent medical encounters, resulting in ongoing stigma and influencing how Plaintiffs and their children are perceived and approached in healthcare settings.

### V. NOTICE OF CLAIM — WIS. STAT. § 893.80

**61.** Plaintiffs' IIED and state tort claims are asserted against the individual defendants in their individual capacities. To the extent § 893.80 notice is required as to Washington County, Plaintiffs assert the notice requirement is tolled by Defendants' fraudulent concealment of the fabricated evidence, and that the individual defendants are not entitled to notice protection because their conduct

was intentional and outside the scope of lawful employment.

## VI. CLAIMS FOR RELIEF

### COUNT I — Fourth Amendment: Unlawful Warrantless Entry
### (Defendants Ewing, Oostdyk, Graper, Herbst, Herman, Does 1–10)

**62.** Plaintiffs incorporate all preceding paragraphs by reference.

**63.** The Fourth Amendment prohibits warrantless entry into a private home absent consent or exigent circumstances. *Payton v. New York*, 445 U.S. 573, 586 (1980); *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Defendants entered Plaintiffs' home without a warrant, without valid consent — compliance obtained under explicit threat of arrest is not voluntary consent, *Bumper*, 391 U.S. at 550 — and without exigent circumstances. No reasonable officer in 2022 could have believed that entering an occupied family home during regular business hours — acknowledging on-scene that a warrant was obtainable — was constitutionally permissible. This violation of clearly established Fourth Amendment rights entitles Plaintiffs to damages in amounts proven at trial.

### COUNT IIA — Fourth Amendment: Unlawful Seizure of Persons
### (Defendants Graper, Herbst, Herman, Ewing, Oostdyk, Does 1–10)

**63a.** Plaintiffs incorporate all preceding paragraphs by reference.

**63b.** The Fourth Amendment protects individuals from unreasonable seizures of their persons. A seizure occurs when, by means of physical force or a show of authority, an officer restrains the freedom of movement of a person in a manner a reasonable person would understand as not being free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Throughout the December 2, 2022 encounter, Defendants physically shadowed Plaintiffs throughout their home, prevented them from moving freely, separated them for interrogation, and told them that refusal to comply would result in arrest. No Miranda warnings were given. Neither Plaintiff was told they were detained. No booking was conducted. A reasonable person subjected to these conditions — surrounded by uniformed law enforcement and CPS personnel, physically shadowed, repeatedly separated, and subjected to an explicit arrest threat — would not have felt free to leave or terminate the encounter. This warrantless, non-consensual seizure of both Plaintiffs' persons, conducted without probable cause, constitutes an independent Fourth Amendment violation. No reasonable officer in 2022 could have believed that seizing two adults inside their own home under these circumstances — without a warrant, probable cause, or exigent circumstances — was constitutionally permissible. Defendants are liable for all damages proximately caused by this unlawful seizure.

### COUNT II — Fourth Amendment: Unreasonable Seizure of Children
### (All Individual Defendants and Does 1–10)

**64.** Plaintiffs incorporate all preceding paragraphs by reference.

**65.** Children have a Fourth Amendment right to be free from seizure absent a court order, parental consent, or exigent circumstances. *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000); *Doe v. Heck*, 327 F.3d 492, 517 (7th Cir. 2003). Defendants removed all five children without judicial authorization and without a genuine emergency. The pre-staged transport equipment — with age- and size-specific seating for each child — confirms the removal was predetermined. No reasonable officer or CPS worker in 2022 could have believed that removing five children pursuant to a pre-staged, coordinated plan — absent a warrant, court order, or genuine emergency — was constitutionally permissible. Defendants are liable for all damages proximately caused by this unreasonable seizure.

### COUNT III — Fourteenth Amendment: Substantive Due Process — Family Integrity
### (All Individual Defendants and Does 1–10)

**66.** Plaintiffs incorporate all preceding paragraphs by reference.

**67.** The Fourteenth Amendment protects the fundamental liberty interest of parents in the care, custody, and companionship of their children. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Children hold a reciprocal liberty interest in familial association. *Brokaw*, 235 F.3d at 1019. Defendants' removal, forced sibling separation, unauthorized religious school enrollment, suppression of homeschooling rights, retaliatory unsupervised-contact restriction on Plaintiff Zehe, years-long chilling of homeschooling, and sustained exclusion of Plaintiffs from their children's medical care and daily lives constituted arbitrary, conscience-shocking infringement of these fundamental rights. Defendants are liable for all resulting damages.

### COUNT IV — Fourteenth Amendment: Procedural Due Process
### (All Individual Defendants and Does 1–10)

**68.** Plaintiffs incorporate all preceding paragraphs by reference.

**69.** Procedural due process requires notice and a meaningful opportunity to be heard before the government deprives an individual of a protected liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Emergency removal of children requires either a pre-deprivation hearing or a true emergency justifying its bypass, followed by prompt post-deprivation process. *Brokaw*, 235 F.3d at 1020. No pre-deprivation hearing was held; no true emergency existed. At the subsequent shelter hearing, Defendants presented fabricated evidence, corrupting the post-deprivation process. Defendants also coerced Plaintiffs into signing CHIPS documents under threat of continued separation, and denied Plaintiffs the opportunity to present evidence of their homeschooling practice. These failures violated clearly established due process rights.

**COUNT V — Fourteenth Amendment: Fabrication of Evidence**
**(Ewing, Oostdyk, Wanke, Does 1–10)**

70. Plaintiffs incorporate all preceding paragraphs by reference.

71. A state official who knowingly fabricates evidence to secure a deprivation of a protected libertyinterest violates the Fourteenth Amendment. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir.2012); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). Defendants fabricated the initial food-absence claim, the infestation and animal feces claims, the every appliance broken appliance and moldy dishes in the sink claims, the tent habitability narrative, the breath-visibility statement (contradicted by IEP records), the homeschooling characterization, the dental neglect claim, the false 'tolerates gluten' medical notations,and the false medical neglect annotation tied to vaccine choice — and disseminated these falsehoods in official reports, in court, to foster families, and in the children's permanent medical records. These fabrications caused and prolonged the removal, influenced foster placement treatment, and continue to harm Plaintiffs at every medical encounter. The pretextual nature of the fabrications is confirmed by theCounty's own February 20, 2023 written determination that all substantiations were overturned because the identified maltreatment was due to poverty — the agency itself documenting that the removal basis was never legitimate neglect.

**COUNT VI — Fourteenth Amendment: Bodily Integrity**
**(Ewing, Oostdyk, Does 1–10, Does 11–15)**

72. Plaintiffs incorporate all preceding paragraphs by reference.

73. The Fourteenth Amendment protects individuals, including children, from unconsented governmental intrusion upon their bodily integrity. *Rochin v. California*, 342 U.S. 165, 172 (1952);*Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003). Defendants subjected all five minor children to forcible physical examinations on December 6 and 8, 2022, without parental consent and without any allegation of abuse justifying the scope of the examinations. All five children — including the infant W.S. and the autistic daughter L.S. — had their genital areas physically examined. Defendants additionally subjected at least one minor boy to forced retraction of intact anatomical tissue, urology referral with surgical intervention discussed, and the administration of hormonal cream and stretching exercises at the foster home — all without parental knowledge, presence, or consent, and all following a deliberate deception in which the children had been told they were going on a sleepover. These acts were conscience-shocking and violated each child's bodily integrity rights. Defendants are liable for all damages including specific psychological trauma sustained by the affected children.

**COUNT VII — ADA Title II / Section 504 Rehabilitation Act:**
**Failure to Accommodate Disabled Minor Child**
**(Washington County)**

74. Plaintiffs incorporate all preceding paragraphs by reference.

**75.** Title II of the ADA prohibits a public entity from excluding qualified individuals with disabilities from its services or subjecting them to discrimination. 42 U.S.C. § 12132. Section 504 independently prohibits disability discrimination by federal-funding recipients. 29 U.S.C. § 794. A public entity must make reasonable modifications to avoid discrimination. 28 C.F.R. § 35.130(b)(7); *Tennessee v. Lane*, 541 U.S. 509, 531 (2004). Washington County receives federal child welfare funding, subjecting it to § 504.

**76.** Plaintiffs' daughter is a qualified individual with autism spectrum disorder with documented sensory hypersensitivity and gluten dietary needs known to Defendants at the time of removal. Washington County, through its foster-placement agents, failed to implement any accommodation plan, imposed sensory-incompatible hairstyling, threatened punishment for disability manifestations, fed gluten to the child in violation of her known dietary restrictions, and then falsely documented in her medical records that she 'tolerates gluten.' Plaintiffs are entitled to compensatory damages, injunctive relief, and further appropriate relief.

### COUNT VIII — Fourteenth Amendment: Continued Deprivation Through Contaminated Medical Records
### (Washington County, Ewing, Oostdyk, Does 1–10)

**77.** Plaintiffs incorporate all preceding paragraphs by reference.

**78.** The constitutional injuries inflicted upon Plaintiffs and their children did not end at reunification. The unlawful foster care designations, false 'tolerates gluten' notations, and false medical neglect annotations associated with vaccine choice were embedded in the children's permanent medical records and were not corrected upon reunification. These entries continue to appear at every subsequent medical encounter, causing healthcare providers to make or consider mandatory CPS referrals, requiring Plaintiffs to repeatedly re-litigate the unlawful removal, and chilling Plaintiffs' ability to freely seek routine medical care for their children. Plaintiffs are entitled to compensatory damages and to injunctive relief compelling Defendants to correct, supplement, or annotate the children's medical records to accurately reflect the unlawful nature of the placement and its subsequent administrative reversal.

### COUNT IX — 42 U.S.C. § 1983: Civil Conspiracy
### (All Individual Defendants and Does 1–15)

**79.** Plaintiffs incorporate all preceding paragraphs by reference.

**80.** A § 1983 civil conspiracy exists where two or more persons, acting under color of state law, agree to deprive a plaintiff of a constitutional right. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). The pre-staged transport minivan with age- and size-specific seating for all five children before any on-scene assessment, combined with the coordinated dissemination of identical fabrications across

multiple records and foster families, and the simultaneous actions of law enforcement and CPS personnel, demonstrates advance coordination to effectuate a predetermined removal. Defendants acted in concert in entering the home, removing the children, deceiving the children about the nature of their removal, fabricating and disseminating false narratives, refusing kinship placement, conducting the second warrantless entry, and continuing post-exoneration harassment. Each co-conspirator is jointly and severally liable for all damages caused by the conspiracy.

### COUNT X — 42 U.S.C. § 1983: Monell Municipal Liability
### (Washington County)

**81.** Plaintiffs incorporate all preceding paragraphs by reference.

**82.** A municipality is liable under § 1983 where a constitutional violation results from an official policy, widespread custom, final policymaker decision, or failure to train amounting to deliberate indifference. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

**83.** Washington County is liable under four independent theories. First, the County maintained a custom of warrantless child removals based on poverty-related conditions without adequate exigency inquiry. The pre-staged transport vehicle — stocked with age- and size-specific seating requiring prior institutional knowledge of the household — could not have been prepared without supervisory authorization, reflecting systemic practice. The County's own written acknowledgment that the removal was poverty-based — ten identical findings on Form DCF-F-5038-E — combined with a long-term caseworker's admission that removal would not have occurred but for Defendant Ewing's personal involvement, establishes that poverty-justified removals were a known and unremedied pattern that constitutes disparate treatment of low-income families relative to comparator families who received services or correction periods for equivalent housing conditions rather than warrantless removal. Second, supervisory personnel ratified Defendant Ewing's removal and fabrications by failing to take corrective action notwithstanding this direct admission. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Third, the County failed to train CPS personnel on the Fourth and Fourteenth Amendment limits on warrantless removal; the obligation to pursue kinship alternatives; the prohibition on evidence fabrication; the duty to accommodate disabled children in foster placement; the prohibition on falsifying dietary and medical records; the obligation to avoid false medical neglect annotations; the prohibition on a second warrantless entry; and the obligation to ensure constitutionally compliant medical records for unlawfully-placed children — all areas where the need for training was obvious and failure to train constituted deliberate indifference. Fourth, the County's policy of imposing retaliatory unsupervised-contact restrictions and continued surveillance against parents who challenge agency determinations reflects final policymaker approval of First Amendment retaliation. The County's failures were the moving force behind each violation suffered by Plaintiffs and their children.

### COUNT XI — First Amendment: Retaliation
### (Ewing, Oostdyk, Wanke, Does 1–10)

**84.** Plaintiffs incorporate all preceding paragraphs by reference.

**85.** The First Amendment prohibits government retaliation for protected petitioning activity. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Plaintiffs engaged in protected activity by filing a formal administrative appeal of the neglect determination. The exoneration letters were dated February 20, 2023 — declaring all ten parent-child findings Unsubstantiated and committing in writing that the maltreatment was due to poverty. The very next day — February 21, 2023 — criminal charges were filed: Case Nos. 2023CF000094 and 2023CF000095. All five counts expressly alleged that harm did not occur. The one-day gap between exoneration and criminal charge initiation constitutes direct evidence of retaliatory motive. No reasonable official in 2023 could have believed that filing criminal charges on the day following a family's formal administrative exoneration — on charges whose own text conceded no harm occurred — was constitutionally permissible. *Bridges*, 557 F.3d at 551. The charges were dismissed prior to the scheduled April 3, 2023 initial appearance, when that court date was cancelled and the charges were resolved without a hearing; the precise dismissal date is within court records and will be confirmed through discovery. CPS also imposed an unsupervised-contact restriction on Plaintiff Melissa Zehe without legal authority, citing concern she would tell her children the truth about their removal. This restriction, combined with the court-induced social media shutdown and the years-long chilling of homeschooling, constitutes a continuing pattern of First Amendment retaliation that extended well beyond the close of the formal proceedings.

### COUNT XII — Wisconsin Common Law: Intentional Infliction of Emotional Distress
### (All Individual Defendants, Individual Capacity)

**86.** Plaintiffs incorporate all preceding paragraphs by reference.

**87.** Under Wisconsin law, IIED requires: (1) intentional or reckless conduct; (2) that was extreme and outrageous; (3) causing; (4) severe emotional distress. *Alsteen v. Gehl*, 21 Wis. 2d 349, 124 N.W.2d 312 (1963); *Rabideau v. City of Racine*, 243 Wis. 2d 486, 502 (2001). This claim is asserted against individual defendants in their individual capacities. Defendants' conduct — the predetermined warrantless seizure of five children after deceiving them they were going on a sleepover; the unlawful seizure of both Plaintiffs' persons inside their own home under threat of arrest; the fabrication of false narratives absent from the official removal record; the unconsented genital examinations of all five children — including the infant and the autistic daughter — days after that deception; the urology referral with surgical intervention discussed and hormone administration directed at the foster home for one minor boy; the separation of a breastfeeding mother from her nursing infants; the false Christmas abandonment statement; the punishment of a disabled child for disability manifestations; the gluten feeding in violation of known dietary restrictions and the false 'tolerates gluten' notation; the false medical neglect annotation for vaccine choice; the theft of first haircut and milestone memories; the

coercive attempt to secure admissions of guilt; the retaliatory criminal charges; the retaliatory unsupervised-contact restriction; the second warrantless entry; the video surveillance of the family's home; the around-the-clock forced family supervision following reunification; and the embedding of multiple categories of false and stigmatizing information in the children's permanent medical records — was extreme and outrageous, exceeding all bounds tolerable in a civilized society, and was undertaken intentionally or with reckless disregard of the near-certainty of severe emotional harm. Defendants are liable for all resulting damages.

## VI-A. REFERRAL FOR CRIMINAL INVESTIGATION

**88.** Plaintiffs hereby provide notice that the conduct described in this Complaint implicates potential criminal violations of federal and state law and respectfully request that this Court, the United States Attorney for the Eastern District of Wisconsin, the Federal Bureau of Investigation Civil Rights Division, and the Wisconsin Department of Justice each consider referral for criminal investigation of the following:

**89. 18 U.S.C. § 242 — Deprivation of Rights Under Color of Law.** Defendants, acting under color of state law, willfully subjected Plaintiffs and their five minor children to the deprivation of rights secured by the Constitution and laws of the United States, including the right to be free from unreasonable search and seizure, the right to family integrity, the right to bodily integrity, and the right to be free from fabricated evidence. The conduct alleged herein — including the warrantless entry and removal, the unlawful seizure of both parents' persons, the unconsented genital examinations of all five minor children, the forced anatomical retraction and urology referral with surgical intervention discussed, and the fabrication and dissemination of false records — constitutes willful deprivation of constitutional rights under color of state law, a federal crime. 18 U.S.C. § 242. Referral is requested to the FBI Civil Rights Division and the United States Attorney for the Eastern District of Wisconsin.

**90. Fabrication of Official Government Records.** Defendants created, authorized, or caused to be created false official records, including: false statements in Deputy Graper's police report characterizing a forced entry as consensual; false medical notations stating that children 'tolerate gluten' without clinical basis; false annotations in the children's permanent medical records characterizing lawful vaccine exemptions as medical neglect; and, upon information and belief, official booking records designating Plaintiffs as 'Arrested 1' and 'Arrested 2' under Agency Case No. 22-39171WCSD when no physical arrest, booking, or detention ever occurred. The creation of false official arrest records constitutes potential violations of Wisconsin Stat. § 946.72 (tampering with public records) and 18 U.S.C. § 1519 (destruction, alteration, or falsification of records). Referral is requested to the Wisconsin Department of Justice and the United States Attorney for the Eastern District of Wisconsin.

**91. False Swearing / Perjury in Official Proceedings.** Lieutenant Tim Kemps swore under oath to the criminal complaint filed February 21, 2023 — charging Plaintiffs with five counts of child neglect, all expressly alleging that harm 'did not occur' — one day after the same County's own administrative panel issued ten written findings that the identified maltreatment was due to poverty and was unsubstantiated. The sworn complaint incorporated statements contradicted by Deputy Graper's own police report and by documentary evidence in CPS's possession at the time of signing, including the children's dental records and school enrollment records. This conduct potentially constitutes false swearing in violation of Wisconsin Stat. § 946.32 and obstruction of justice in violation of 18 U.S.C. § 1512. Referral is requested to the Wisconsin Department of Justice and the FBI.

**92.** Plaintiffs make these referrals not to delay or complicate these civil proceedings, but because the gravity of the conduct alleged — including the unconsented examination of five minor children's genitals, the fabrication of official arrest records, and the retaliatory prosecution of parents one day after their administrative exoneration — warrants the attention of criminal law enforcement independent of and in addition to the civil remedies sought herein.

## VI-B. NOTICE OF NON-RETALIATION DEMAND

**93.** Plaintiffs Melissa Zehe, Jacob Sabel, and their five minor children explicitly and unequivocally demand that no retaliation of any kind be taken against them, their children, their family members, or any witnesses arising from or in connection with the filing of this Complaint. This demand is made directly, on the record, and in the strongest possible terms.

**94.** Retaliation for the filing of a federal civil rights complaint is itself a federal civil rights violation. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); 42 U.S.C. § 1983. Any adverse action taken against Plaintiffs or their children — including but not limited to renewed CPS contacts, child welfare investigations, removal proceedings, criminal referrals, school interventions, social services actions, or any other government action targeting this family — following the filing of this Complaint will be treated as direct evidence of retaliatory conduct and will be immediately reported to this Court, the United States Attorney for the Eastern District of Wisconsin, and the FBI Civil Rights Division.

**95.** Plaintiffs have already experienced one documented cycle of retaliation following protected activity: within twenty-four hours of their administrative exoneration on February 20, 2023, criminal charges were filed against both parents. Plaintiffs will not tolerate a second cycle. Any government actor who initiates, authorizes, directs, or facilitates retaliatory action against this family following the filing of this Complaint does so with full knowledge that such action will be treated as an independent constitutional violation subject to additional litigation, criminal referral, and judicial sanction.

**96.** This family seeks justice, accountability, and protection — not conflict. They have cooperated with every legitimate government process available to them. They have exhausted administrative remedies.

They have documented every relevant event to the best of their ability. They bring this action because the system failed them at every level, and because no family — regardless of income, parenting style, or lifestyle — should be subjected to what this family endured. Plaintiffs ask only that this Court hold Defendants accountable under the law, and that no further harm come to this family as a result of their decision to seek that accountability.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Melissa Zehe, Jacob Sabel, L.S., B.S., C.S., A.S., and W.S., through their next friends, respectfully request that this Court enter judgment in their favor and against Defendants, and grant:

A. Compensatory damages in an amount to be proven at trial for all physical, emotional, reputational, and economic harm sustained by Plaintiffs and their minor children as a result of Defendants' constitutional and statutory violations, including lost income, loss of business, loss of milestone memories, ongoing medical record harm, and continuing CPS-anxiety-driven life disruption;

B. Punitive damages against each individual Defendant sufficient to punish and deter the intentional, reckless, and conscience-shocking conduct alleged herein;

C. A declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 declaring that Defendants' warrantless entries, unlawful seizure of Plaintiffs' persons, predetermined warrantless removal, fabrication of evidence, bodily integrity violations, failure to accommodate disability, contamination of medical records, and post-exoneration retaliation violated Plaintiffs' rights under the Fourth and Fourteenth Amendments, Title II of the ADA, and Section 504 of the Rehabilitation Act;

D. Permanent injunctive relief enjoining Washington County and its CPS personnel from: (i) conducting warrantless entries or removals absent genuine, objectively documented exigent circumstances; (ii) denying kinship placement without individualized written justification; (iii) failing to provide ADA-compliant accommodation plans for disabled children in county-supervised foster care; (iv) retaliating against parents who exercise constitutional rights in challenging agency determinations; and (v) imposing unsupervised-contact restrictions without a lawful judicial order;

E. Injunctive relief requiring Defendants to take affirmative steps to correct, supplement, or annotate the minor children's medical records to accurately reflect the unlawful nature of the removal and its subsequent administrative reversal, and to remove or correct the false 'tolerates gluten' notations and false medical neglect annotations associated with vaccine choice;

F. Damages and equitable relief under Title II of the ADA and Section 504 of the Rehabilitation Act, including prospective relief ensuring Washington County implements adequate disability accommodation policies;

G. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a;

H. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

I. An order referring the conduct described herein to the United States Attorney for the Eastern District of Wisconsin, the Federal Bureau of Investigation Civil Rights Division, and the Wisconsin Department of Justice for investigation of potential criminal violations including 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1519 (falsification of records), Wisconsin Stat. § 946.72 (tampering with public records), and Wisconsin Stat. § 946.32 (false swearing);

J. Such other and further relief as this Court deems just and proper.


## VIII. JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.


Respectfully submitted,

_Melissa Zehe_

Melissa Zehe, Pro Se Plaintiff
1181 Decorah Road, West Bend, WI 53095
Phone: (262) 419-8974
Email: sabelfamily2828@gmail.com


Dated: 04/10/2026


_Jacob Sabel_

Jacob Sabel, Pro Se Plaintiff
1181 Decorah Road, West Bend, WI 53095
Phone: (414) 510-1720
Email: sabelfamily2828@gmail.com


Dated 04/10/2026